# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* JONES/HERRON, Minors.

UNPUBLISHED
October 4, 2018

No. 343121
Oakland Circuit Court
Family Division
LC No. 2016-839348-NA

Before: JANSEN, P.J., and METER and STEPHENS, JJ.

PER CURIAM.

Respondent-mother appeals as of right the trial court's order terminating her parental rights to three of her minor children, LJ, JH, and DH, pursuant to MCL 712A.19b(3)(c)(*i*).[1] We affirm.

## I. FACTUAL BACKGROUND

LJ, JH, and DH came under the care of petitioner, the Department of Health and Human Services (the DHHS), following allegations that their welfare was at risk due to respondent's physical neglect and improper supervision. On February 12, 2016, petitioner filed a petition for temporary custody of LJ, JH, and DH because respondent had abandoned the children and left their maternal grandmother to care for them without physical or financial support, respondent lacked suitable housing, respondent was unemployed, and respondent could not provide for her minor children. LJ had been with her maternal grandmother since birth, and JH and DH had been with their maternal grandmother for at least six months. Petitioner went on to allege that respondent's home was being heated by an open oven, there were large holes in the wall caused by a domestic violence incident between respondent and her alleged boyfriend, Marvin Johnson, there were bugs in the home, and it was not clean with dirt and debris on the floor. Respondent entered a plea of no contest to the petition, and the trial court entered an order of adjudication on April 25, 2016.

---

[1] The children's fathers were not respondents in these proceedings. Respondent has two older children who were in a guardianship with their grandmother, and an infant child, AM, who was born during these proceedings. Respondent's parental rights to those three children were not terminated and are not at issue on appeal.

-1-

Over the next fifteen months, respondent struggled to fully comply with the treatment plan she had voluntarily entered into. Following a three-day hearing, the trial court found that there were statutory grounds to terminate respondent's parental rights pursuant to MCL 712A.19b(3)(c)(*i*). Following a four-day best interests hearing, the trial court also found that it was in the best interest of the minor children to terminate respondent's parental rights. Accordingly, the trial court entered an order terminating respondent's parental rights to LJ, JH, and DH. This appeal followed.

## II. STATUTORY GROUNDS FOR TERMINATION

Respondent first argues that the trial court erred in finding that clear and convincing evidence supported termination of her parental rights under MCL 712A.19b(3)(c)(*i*). We disagree.

We review a trial court's determination regarding a statutory ground for termination for clear error. MCR 3.977(K); *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). "A finding of fact is clearly erroneous where the reviewing court is left with a definite and firm conviction that a mistake has been made." *In re Terry*, 240 Mich App 14, 22; 610 NW2d 563 (2000). When reviewing a trial court's findings of fact, this Court affords deference to the special opportunity of the trial court to judge the credibility of the witnesses. *In re Fried*, 266 Mich App 535, 541; 702 NW2d 192 (2005).

The trial court found that termination of respondent's parental rights to LJ, JH, and DH was justified under MCL 712A.19b(3)(c)(*i*), which permits termination in the following circumstance:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

The trial court did not clearly err by finding that clear and convincing evidence supported termination of respondent's parental rights pursuant to MCL 712A.19b(3)(c)(*i*).

Respondent argues that her lack of appropriate housing was the primary concern that led to the children's adjudication and that any risk involved with her continued relationship with Johnson, the putative father of JH and DH, was not the gravamen of the initial petition. Respondent is correct that the original petition noted concerns with her lack of suitable housing, her unemployment, her inability to provide for the children, and her abandonment of the children at their maternal grandmother's house without physical or financial support. But the petition referenced Johnson when describing the unsuitability of respondent's apartment, which included large holes in the walls in the children's bedroom due to a domestic violence incident between respondent and Johnson. Moreover, at the preliminary hearing, petitioner's investigator, Kristen

Field, identified the risk of continued domestic violence as a concern that, standing alone, was sufficient cause for the children's removal. When respondent sought judicial review of the referee's recommendation to place the children outside the home, petitioner again referred to the respondent's relationship with Johnson as a circumstance that required evaluation. Most significantly, the trial court obtained jurisdiction over the children based on respondent's no-contest plea, which included respondent's agreement that domestic violence with Johnson remained an ongoing concern. Therefore, contrary to what respondent argues, domestic violence between respondent and Johnson was a condition that led to the children's adjudication.

Further, more than a year after the 182-day statutory period, the trial court found that respondent was complying with much of her parent-agency treatment plan, but part of that plan also required respondent to maintain healthy relationships. Throughout the proceedings, the trial court, caseworkers, and respondent's domestic violence program urged respondent to stay away from Johnson and keep her children away from him because they feared him. Nevertheless, respondent continued the relationship, was dishonest about having ended it, and even conceived another child, AM, with Johnson. Moreover, respondent exposed the children to Johnson at various visits and through electronic communications. According to the maternal grandmother, respondent even missed portions of a long weekend holiday visit with the children because she was upset that the grandmother would not bring the children to see Johnson. The referee characterized respondent's choice to maintain a secret relationship with Johnson, contrary to her domestic violence treatment, as "deviousness," "improper decision-making," and lack of maturity, and it found that respondent had demonstrated this immaturity throughout the proceedings. In light of respondent's immature decision-making and her continued relationship with Johnson, we are not left with a definite and firm conviction that a mistake was made when the referee found clear and convincing evidence that respondent's volatile and unhealthy relationship with Johnson was a condition that led to the adjudication and continued to exist, and given respondent's pattern of behavior regarding Johnson, there was no reasonable likelihood that this condition would be rectified within a reasonable time. By the time of the referee's statutory-basis finding, the children had been removed from respondent's care for more than 20 months. During that time, respondent ignored all directives to end her relationship with Johnson, continued to see him in secret, and lied about doing so. Thus, the court did not clearly err in finding that there was no reasonable likelihood that respondent would end the relationship within a reasonable time.

On appeal, respondent attempts to minimize any risk to the children by arguing that there has been no evidence of additional abuse by Johnson since the inception of the case. Although the court did not learn of any additional abuse, there was evidence of continued volatility between respondent and Johnson. In 2017, respondent was charged with reckless driving when the vehicle she was driving hit a brick wall while she angrily chased her boyfriend. Moreover, respondent's children remained terrified of Johnson, but respondent continued to expose Johnson to the children.

Respondent also argues that the statutory basis finding with regard to LJ, JH, and DH is incongruous with the court's subsequent determination that no statutory basis existed to terminate respondent's rights to the infant, AM, pursuant to a separate petition. This argument is unpersuasive because the trial court specifically distinguished the older children's situation with that of the infant. LJ, JH, and DH had been removed from respondent's care for nearly two

years. Indeed, JH and DH had spent more time with their foster mother than respondent. Conversely, AM had just been removed. Therefore, petitioner was unable to satisfy the 182-day statutory period under § 19b(3)(c)(*i*) with respect to AM. Moreover, in determining what constitutes a reasonable time to rectify a condition, a court is required to consider the age of the child. Considering the length of time the older children had already spent in the temporary custody of the court, the trial court did not clearly err in finding that a reasonable time to rectify the condition for LJ, JH, and DH was significantly shorter than the time available for AM.

Respondent also objects to the inclusion of her substance abuse in the referee's report. She argues that substance abuse was not a condition that existed at the time of the adjudication, and therefore, any drug issues required proof by legally admissible evidence. Despite her contention that substance abuse was a new issue, respondent does not actually cite any evidence of substance abuse that was not legally admissible. She merely cites *In re Snyder*, 223 Mich App 85; 566 NW2d 18 (1997),[2] and notes that substance abuse issues were not alleged in the original petition, and therefore argues that it was improper to reference substance abuse in the referee's report. Even if we credit respondent's argument that substance abuse was a new condition, that does not mean that it was improper for the trial court to consider evidence of respondent's substance abuse, provided such evidence was legally admissible. Because respondent fails to identify any evidence that she believes was not legally admissible and fails to make any argument regarding admissibility under the Michigan Rules of Evidence, she has abandoned any claim of error in this regard. "An appellant may not . . . give issues cursory treatment with little or no citation of supporting authority." *Houghton ex rel Johnson v Keller*, 256 Mich App 336, 339; 662 NW2d 854 (2003), see also *People v Kevorkian*, 248 Mich App 373, 389; 639 NW2d 291 (2001) ("[i]t is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position"). Regardless, it is clear that the trial court did not rely on substance abuse to substantiate its finding with respect to MCL 712A.19b(3)(c)(*i*). Instead, it stated that it could not conclude that respondent's substance abuse was a problem that she "could not remediate . . . within a reasonable amount of time." Therefore, we reject this claim of error.

In sum, the trial court did not clearly err in finding that the statutory basis for termination in § 19b(3)(c)(*i*) was established by clear and convincing evidence.

---

[2] In *Snyder*, 223 Mich App at 87, children were removed because of unsafe and unsanitary conditions of the home. While the children were in foster care, they made statements indicating that they had been sexually abused, which led to the filing of a termination petition. *Id*. On appeal, this Court agreed that under former MCR 5.974 (now MCR 3.977), "the grounds for termination [were] unrelated to the basis on which the probate court initially established its jurisdiction over the children," and so legally admissible evidence was required to establish the statutory grounds. *Id*. at 90.

## III. BEST INTERESTS

Respondent also argues that termination of her parental rights was not in the children's best interests. We disagree. We review for clear error a trial court's determination regarding a child's best interests. MCR 3.977(K); *In re Mason*, 486 Mich at 152.

Once a statutory ground for termination is established, the trial court shall order termination of parental rights if it finds that termination is in the child's best interests. MCL 712A.19b(5). "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). The trial court should weigh all the evidence available to it in determining a child's best interests. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). Factors relevant to a determination of a child's best interests include the child's bond to the parent, the parent's compliance with his or her case service plan, the parent's history of visitation with the child, the child's need for permanency, stability, and finality, the advantages of a foster home over the parent's home, and the possibility of adoption. *Id*. at 713-714.

More than a preponderance of the evidence supports the trial court's determination that termination of respondent's parental rights was in the children's best interests. Respondent argues that she and the children shared a bond, and termination would disrupt the siblings' relationships. The record demonstrates that the children generally enjoyed visitation and were excited to see respondent. But throughout the children's lives, a parent-child relationship had little opportunity to develop. Respondent never cared for LJ independently. LJ lived with her grandmother from the time she was born until the initiation of these proceedings, when her father began caring for her. The children's grandmother testified that respondent would "go and come as she pleased." After JH and DH were born, respondent initially took custody of them, but ultimately abandoned them with the grandmother also. During the proceedings, respondent never advanced to unsupervised parenting time, and she only spent one to two hours with the children each week.

Moreover, "[a]lthough 'in most cases it will be in the best interests of each child to keep brothers and sisters together . . . , if keeping the children together is contrary to the best interests of an individual child, the best interests of that child will control.' " *In re Olive/Metts*, 297 Mich App 35, 42; 823 NW2d 144 (2012) (citation omitted). Respondent has six children in four separate placements. During the proceedings, sibling visits initially occurred at the grandmother's home, where respondent's two oldest children live. But because respondent compromised the children's safety during those visits by exposing them to Johnson, sibling visits between LJ, JH, DH, and eventually AM, were held at the agency. Following termination, JH and DH, who are the only children who had ever lived together in respondent's sole care, remain together. Nothing prevented the remaining children from visiting one another, just as they had been visiting one another throughout their lives.

The record demonstrates that respondent complied with portions of the case service plan, such as by obtaining housing and mostly remaining employed, but she failed in other important respects. Again, respondent was required to maintain healthy relationships, but she continued a secret relationship with her abuser, Johnson, and exposed the children to him as well. In addition, during these proceedings, respondent continued her volatile relationship with LJ's

father and assaulted him after a family team meeting, which resulted in a conviction. Respondent was required to attend individual and group therapy at PRISM, but after the statutory-basis hearing, she disengaged completely from individual therapy. Around the same time, respondent's substance abuse screening levels worsened, including positive results for THC and cocaine, and then respondent stopped required testing altogether.

Again, respondent had two hours of visitation weekly with JH and DH, and one hour a week with LJ. Respondent was consistently late to visits and when she canceled, the children were not disappointed. The foster care worker testified that respondent's quality of visitation with the children varied widely. Sometimes, respondent was attentive and interacted with all of the children. On other occasions, she used visitation to interrogate LJ about her father, or DH would run out of the room because respondent was not monitoring the toddler. The foster care worker opined that respondent would have a "really difficult time managing" all the children independently.

The foster care worker testified that, LJ in particular, needed the stability that termination would provide. LJ was emotional every time she came to the agency office. According to the worker, "[s]he's not handling this well" and she is very fearful of Johnson. The worker also noted that the relationship between respondent and LJ's father was "toxic" and she had concerns that, without termination, the toxicity could "overflow into [LJ's] life." LJ was doing well with her father and succeeding at an honors school. Given the trial court's finding that it would be devastating for LJ if respondent and LJ's father were to coparent, respondent's argument—that placement with a relative should have mitigated against termination—is inapposite. See *In re Mason*, 486 Mich at 164.

The trial court noted that respondent had demonstrated emotional instability throughout the proceedings, not just with abusive relationships and substance abuse, but even her reckless driving into a brick wall. When the petition was filed, JH was almost three years old, and DH was approximately 15 months old. Although they had initially lived with respondent after birth, they had been living with their grandmother for at least six months. In contrast, the children had both spent more than two years with their foster mother. They looked to her for comfort and praise. When they went to visit respondent, they sought reassurance that they would be returning to their foster mother, who expressed the intent to adopt JH and DH.

Respondent argues that the foster mother was unsuitable, objecting to her advanced age and noting that the children had some injuries and health concerns while in the foster mother's care. Respondent also suggests that the agency's placement cannot be trusted because it failed to timely notify her of the children's injuries and health concerns. But the record demonstrates that the agency was carefully considering the foster mother's age with regard to any adoption and planned to require another adult who could care for the children if anything happened to the foster mother. Respondent's ignorance regarding DH's broken leg was, in part, her responsibility because the foster care worker called respondent, but respondent never returned the calls. Moreover, the agency investigated the home after the injuries and health concerns, and identified no safety issues. Afterward, the court ordered close monitoring of the placement.

Given the continuing risks to the children, including respondent's abusive relationship, substance abuse, and emotional volatility, and considering the ages of the children and their need

for permanency and stability, the trial court did not clearly err in finding that termination of respondent's parental rights to LJ, JH, and DH was in their best interests.

Affirmed.

/s/ Kathleen Jansen
/s/ Patrick M. Meter
/s/ Cynthia Diane Stephens